UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 2:14-CR-42 |
| ) | |
| JAMARCUS LAVELLE JACKSON ) | |

### REPORT AND RECOMMENDATION

The Defendant has filed a Motion to Suppress any pretrial or in-trial identification of the Defendant by two witnesses, *Joshua Ross Mould* (hereinafter "Mould") and *John Michael Calandros* (hereinafter "Calandros"). [Doc. 37]. The United States has filed a Response, objecting to the motion. [Doc. 50]. On June 25, 2015, the Court held an evidentiary hearing on the Defendant's Motion.

At the hearing, Mould did not appear although he had been subpoenaed by the United States.[1] The Defendant objected to Mould's absence, advising the Court that he intended to call Mould as a witness to support his factual allegations. The Defendant requested the Court continue the hearing to a date when Mould would be available.[2] The Court declined to continue the hearing at the time but permitted the Defendant to make an offer of proof to determine whether reopening the hearing later was necessary. (Doc. 57,

---

[1] The government announced that Mould was hospitalized out of town and would not be available until probably the end of July.
[2] The jury trial is set for August 4, 2015. The Defendant objected to any continuance of the trial date even though continuing the motion hearing until the end of July would create a challenging time frame given that the parties have 14 days to file any objections to the undersigned's Report and Recommendation filed in this action.

1

Order). On July 6, 2015, the Defendant filed his offer of proof. (Doc. 62). Based on the Defendant's offer of proof, the Court finds there is no need to reopen the motion hearing and issues this Report and Recommendation. Based on the pleadings filed in relation to this Motion and the evidentiary hearing, the undersigned recommends that the Motion to Suppress [Doc. 37] as to Mould's and Calandros' identification of the Defendant be DENIED.

# I.
## FACTUAL BACKGROUND

In the early morning hours of March 23, 2014, outside the "Battery," a bar in Johnson City, Tennessee, Johnson City Police officers found the Defendant being held on the ground by a number of individuals. Mr. DeShaun Greer ("Greer") was lying nearby on the ground suffering from a number of gunshot wounds. Greer died later that day from the gunshot wounds.

Officers arrested the Defendant and transported him to the Johnson City Police headquarters and brought him into the building through a back entrance into the Criminal Investigations Division ("C.I.D.") for questioning. C.I.D. is separated from the roll call room where another officer was interviewing witnesses.

At 3:40 a.m.,[3] Investigator Bobby Odom ("Odom") advised the Defendant of his *Miranda* rights. The Defendant exercised his right to remain silent. From that point until 6:42 a.m., various investigative activities such as evidence collection occurred with the

---

[3] Odom testified that the time stamp on the video was one hour and fourteen minutes off. (Exhibit 4). Odom reviewed the Miranda warnings with the Defendant and announced the time as 3:40 a.m. when the Defendant exercised his right to remain silent.

Defendant, but the Defendant remained in the room. According to Odom, at 6:42 a.m. officers escorted the Defendant down the hallway past the door to the roll call room for him to use the bathroom. At that time, Mould was present in the roll call room and saw the Defendant walk by.

A.   Joshua Mould's identification

Investigator Justin Adams ("Adams") interviewed Mould between 5:00 a.m. and 5:18 a.m. in the roll call room. Mould gave a statement about the events of that evening and identified the Defendant from a photo array as the one who shot and killed Greer that morning.[4] (Exhibits 1 and 2). Adams could not recall the exact time he showed Mould a photo array, but testified that it was either a few minutes before the interview began (5:00 a.m.) or a few minutes afterward (5:18 a.m.). Adams does not recall the Defendant ever walking by the roll call room during the time he interviewed Mould.

The Defendant's offer of proof of Mould's testimony was that Mould would say he saw the Defendant at some point that evening when the Defendant walked by the roll call room. Whether it was before or after Mould identified the Defendant from the photo array, the Defendant could not say.[5]

B.   John Calandros' identification

On the evening of March 22, 2014, Calandros was providing security services for the Battery. During his evening shift, he noticed the Defendant and Greer bump shoulders. He

---

[4] Although the date on the statement indicates March 24, 2014, Adams testified that the actual date he interviewed Mould was the early morning of March 23.

[5] "[T]he defendant cannot represent at this time whether Mr. Mould would testify that he picked out the defendant from the photopack before or after he saw the defendant walk past the doorway." (Doc. 62, pageID# 204).

3

then watched them engage in what he describes as a "mean mugging." In other words, they were angrily staring each other down. When the tension between them settled down, Calandros went back to his other job duties.

After Calandros broke up a fight involving Greer's brother, near closing time, Calandros saw Greer walking around in the bar sporting a pump knot on his face, looking for the person who had hit him. Calandros attempted to calm Greer down, but Greer was ready to leave the bar. Calandros followed Greer out the bar.

Greer headed off to the right of Calandros, toward his vehicle, when Calandros heard a number of individuals call out "there he is, get 'em!" Calandros turned to his left and saw the Defendant walking up the street toward him. The Defendant stopped about 15 yards away from him.

Greer, who was less than 10 yards away to Calandros' right, turned around and started walking towards the Defendant. For about 20 seconds, Calandros observed the Defendant standing his ground as Greer continued walking toward the Defendant. When Greer was about three yards away from the Defendant, Calandros saw the Defendant pull out a gun and start firing at Greer, killing him.

Immediately after the shooting, another employee, Mike Parr, tackled the Defendant. A couple other employees helped Mr. Parr keep the Defendant on the ground and remove the firearm from his hand. When the police arrived, Calandros left the scene and returned inside the bar.

A couple of days later, Calandros contacted Johnson City Police to give a statement

about what he saw that evening of the shooting. Odom took a statement from Calandros but did not show him a photo array and did not ask him for a specific description of the shooter. Odom testified that he did not do either of these because he felt very comfortable with the quantity of evidence he already had against the Defendant.[6] According to Odom, everything Calandros said about that evening's events was consistent with what other witnesses had told Odom.

The next time Calandros saw the Defendant was at the Defendant's preliminary hearing in General Sessions Court on April 1, 2014. At that hearing, Calandros was called as a witness and positively identified the Defendant as the shooter.

## II.
## DEFENDANT'S CONTENTIONS

Defendant contends that Mould and Calandros' identification of the Defendant were products of an "impermissibly suggestive" police procedure in violation of the Due Process Clause of the Fifth Amendment. With respect to Mould's identification, Defendant asserts in his motion that Mould saw the Defendant at the police station *prior* to identifying him in a photo array when officers, in escorting the Defendant to the restroom, walked the Defendant by the room where Mould was waiting. Mould, the Defendant contends, saw the Defendant's face as he walked by which poisoned his later identification of the Defendant.

Regarding Calandros' identification, Defendant contends that law enforcement did not show a photo array to him nor solicit a description of the shooter for fear that he would get it wrong. Instead, law enforcement relied on Calandros to identify the Defendant as the

---

[6] Apparently, law enforcement interviewed numerous witnesses who identified the Defendant as the shooter.

5

shooter for the first time at the preliminary hearing in state court, "when [the Defendant] was in jail clothes and shackles at the state preliminary hearing." (Doc. 37, pageID# 79). He contends that the failure to seek an identification prior to the preliminary hearing coupled with the Defendant being in shackles at the preliminary hearing made Calandros' in-court identification of the Defendant in violation of the Fifth Amendment's Due Process Clause.

## III.
## DISCUSSION

The Fifth Amendment to the United States Constitution protects individuals from identification procedures that are both "suggestive and unnecessary" or otherwise conducive to mistaken identification. *Williams v. Bauman*, 759 F.3d 630, 638 (6th Cir.), *cert. denied*, 135 S.Ct 876 (2014)(quoting *Perry v. New Hampshire*, -- U.S. --, 132 S.Ct. 716, 724 (2012)); *see also Manson v. Brathwaite*, 423 U.S. 98 (1977). If the police utilized identification procedures that were suggestive and unnecessary, then "suppression of the identification is warranted only if, on the totality of the circumstances, 'improper police conduct created a substantial likelihood of misidentification.'" *Williams,* 759 F.3d at 638 (quoting *Neil v. Briggers,* 409 U.S. 188, 201 (1972)).

Thus, a two prong analysis applies in addressing constitutional issues surrounding police identification procedures. First, the Defendant must show that the pretrial identification procedure was impermissibly suggestive. *United States v. Hill*, 967 F.2d 226, 230 (6th Cir.)(defendant bears the burden of proving identification procedure was unduly suggestive), *cert. denied,* 506 U.S. 964 (1992). If he succeeds on that issue, but only if he

6

succeeds on that issue, will the court then analyze whether the identification was nevertheless reliable under the totality of the circumstances. *Ledbetter v. Edwards,* 35 F.3d 1062, 1070-72 (6th Cir. 1994); *Manson,* 432 U.S. at 114-17; *Perry*, 132 S.Ct. at 724 ("[e]ven when the police use such a [suggestive] procedure, … suppression of the resulting identification is not the inevitable consequence"). The Court will now address each witnesses' identification.

### A.
### MOULD'S IDENTIFICATION

Investigator Adams interviewed Mould sometime between 5:00 a.m. and about 5:18 a.m. Mould identified the Defendant from a photo array either right before 5:00 a.m. or right after 5:18 a.m. The Defendant concedes that it was when he was escorted to the restroom that Mould saw him. The evidence establishes that he was escorted to the bathroom at 6:42 a.m. well after the time Mould had identified him as the shooter. The Court credits the testimony of Odom and Adams in this case and finds that Mould identified the Defendant prior to seeing the Defendant walk by the room where he was waiting.

That notwithstanding, even assuming an issue about the timing of Mould seeing the Defendant, law enforcement did nothing that would have suggested to Mould that the Defendant was the shooter. No officer interacted with Mould and the Defendant in any way when they escorted the Defendant to use the bathroom facilities. The Defendant does not identify any improper police activity that would otherwise be unduly suggestive other than merely escorting the Defendant to use the restroom. Under the facts of this case, law

7

enforcement's escorting the Defendant by a room where Mould was present so the Defendant could use the restroom was not a "unnecessarily suggestive identification procedure." *Perry,* 132 S.Ct. at 726. At most, any contact between the two was inadvertent and not part of any arrangement orchestrated by law enforcement. *United States v. Monroe*, 833 F.2d 95, 101 (6th Cir. 1987)(where witnesses' identification was based on their contact with the defendant at the time of the crime, in-court identification after inadvertently seeing the defendant in custody and in jail clothing shortly before trial did not deny defendant due process).

Accordingly, the Court RECOMMENDS that the Defendant's Motion to Suppress (Doc. 37) Mould's identification of him be DENIED.

B.
CALANDROS' IDENTIFICATION

Calandros testified that he personally witnessed the Defendant shoot and kill Greer in the parking lot. When law enforcement interviewed him a few days later, they did *not* present a photo array to see if Calandros would identify the Defendant and did not ask him to describe the shooter. Odom testified that he did not feel that he needed to do so given the amount of evidence he already had against the Defendant.

Instead, Odom allowed the court process to take its course. In Tennessee, when charged in state court, a defendant is entitled to a preliminary hearing. *See* Rule 5(e)(1) Tenn. R. Crim. Pro. ("Any defendant arrested … prior to indictment … for a felony … is entitled to a preliminary hearing…."). In this case, the Defendant elected to have a preliminary hearing. At that hearing, the State called Calandros who identified the

8

Defendant as the shooter.  Calandros was subject to cross-examination by the Defendant's counsel.

The Defendant argues that it is the combination of the lack of pretrial identification procedures and the presentation of the Defendant in court that corrupted Calandros' identification of him such that it violated his Fifth Amendment Due Process Rights.  The focus of the cases dealing with eye witness identification, however, has been on improper police procedures that taint a subsequent in-court identification, not the lack of them.  See *Perry v. New Hampshire*, 132 S. Ct. 716, 721 (2012)("Our decisions, however, turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array"); see also *Howard v. Bouchard*, 405 F.3d 459, 469-70 (6th Cir. 2005)("Unnecessary suggestiveness generally depends "upon whether the witness's attention was directed to a suspect because of police conduct")(citation omitted).

While there is no question that there is a degree of suggestiveness to an in-court identification, it is not a result of improper law enforcement conduct.  Moreover, the Defendant has not cited one case nor has the Court found one that held that a witness is precluded from identifying a defendant in-court where there have been no previous identifications in the presence of law enforcement.  Indeed, in those circumstances, the reliability of the in-court identification is tested "through the rights and opportunities generally designed for that purpose, notably, …vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification

9

and the requirement that guilt be proved beyond a reasonable doubt." *Perry,* 132 S. Ct. at 721; *see also United States v. Davies,* 768 F.2d 893, 904 (7th Cir.) *cert. denied,* 474 U.S. 1008 (1985) ("[g]enerally, the question of the suggestiveness or credibility of the in-court identification is to be resolved ultimately by the jury after the defendant has had an opportunity to test the accuracy of an identification through cross-examination"); *United States v. Whatley*, 719 F.3d 1206, 1216 (11th Cir.) *cert. denied,* 134 S. Ct. 453 (2013)(the defendant "did not have a constitutional right to a pre-trial line-up or array of photographs").

So even if Calandros' in-court identification of the Defendant at the preliminary hearing was suggestive, his testimony would not be excluded as it was not derived from "improper law enforcement activity." *Perry,* 132 S.Ct. at 720-21. "[W]ithout the taint of improper state conduct" there is no need for the trial court to screen the evidence for reliability before allowing the jury to assess its creditworthiness. *Id.* at 728.

Though it is not necessary for this decision, the Court finds Calandros' identification of the Defendant reliable under the "totality of the circumstances." Calandros saw the Defendant a number of times that evening. At the evidentiary hearing before this Court, he had no doubt about the Defendant's identity. Specifically, he saw the Defendant that evening in the bar and watched him as he stared down Greer after they bumped each other. He watched the Defendant walk down the street and stop only 15 yards away from him. He also watched Greer walk toward the Defendant as the Defendant stood there. When Greer was only a few feet away, he watched the Defendant pull out the gun and fire it at Greer.

He testified that he was "100% confident" that the Defendant possessed the firearm and shot and killed Greer that evening. Moreover, the Defendant points to no police activity that would have otherwise suggested to Calandros that the Defendant was the shooter. Finally, he identified the Defendant on April 1, 2014, the date of the Defendant's preliminary hearing, only a few days after the incident.

Accordingly, the Court RECOMMENDS that the Defendant's Motion to Suppress (Doc. 37) Calandros' identification of him be DENIED.[7]

SO ORDERED.

                                            s/Clifton L. Corker
                                        United States Magistrate Judge

---

[7] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).